Mr. Chief Justice, and may it please the Court, the California Supreme Court's denial of Respondent's ineffective counsel claim was entitled to the deferential review for reasonableness prescribed by 28 U.S.C. § 2254d. By its plain terms, nothing in 2254d requires a State court to render a reasoned or reasonable or explained decision, nor is there anything in § 2254d that would treat Strickland claims differently from any other Federal constitutional claim. Here, the Ninth Circuit failed to give the State court decision the proper deference, indeed double deference, it was owed. Rather than applying this Court's proper and, excuse me, clearly established Strickland standard, the Court of Appeals employed its own eccentric rule that essentially requires counsel to always consult with and present expert testimony in every case in which the prosecution. Ginsburg. But how do we know that the California court even reached that question? Because there was — wasn't there a motion to deny review as — wasn't there a time bar question raised? There was a procedural bar that was argued in the informal opposition to the petition for writ of habeas corpus that had been requested by the California Supreme Court. It did not invoke that bar as a basis for denying relief. Under well-established Of course, it said — it just said denied on the merits, and it's still not clear to me how to distinct — pardon me. It just said denied. Yes. It's still not clear to me how to distinguish that between deny and deny on the merits. Do we say, when there's a one-line order as in this case where it says simply deny, that it is presumptively on the merits? I mean, how do we interpret that? Yes. In fact, that is a well-settled and long-established practice, local practice that's well understood by not only the litigants but the State and Federal courts of the Ninth Circuit, dating back to the Ninth Circuit's 1974 decision in Harris v. Superior Court. That it is presumptively on the merits? Yes. I don't — is that the way it's stated? Don't let me use my formulation. What's the State's formulation? The State's formulation is that the silent or so-called summary denial is on the merits unless the State court indicates otherwise in a court. Now, that can't be a Ninth Circuit rule. I mean, that has to depend upon each of the States in the Ninth Circuit, no? I mean, some State could have a different rule, I assume. You're telling us, however, that California has that rule? Yes. And that rule, again, has been well established. Well, if I'm on the California court and I have two choices, one is to say denied, no explanation in this case. The other is to say denied on the merits. If I have those two options, then why are they both on the merits? Again, because it has certainly been well understood for at least three and a half decades that when the California Supreme Court renders a so-called silent denial, that it is on the merits unless the court ordered it. And what is the leading California authority on that proposition? That would be N. Ray Robbins, in which case. That's the Robbins case, okay. Yes, which is discussed in our brief as well as in the reply. All right. Thank you. Sotomayor, did you answer Justice Kennedy's question? I'm sorry? I don't know you answered his question. His question was, if you can deny or deny on the merits, what's the difference between the two? There really is no substantive distinction. Two choices, so they have to have different meanings in some way. I would submit that there is no substantive distinction between an order that simply reflects denied versus one that reflects denied on the merits. They showed us the docket for that day of the denial here. Yes. And there were different ones. If it's the same court taking action, why would they choose one over the other for particular cases? Well, I submit that there could be any number of reasons, not the least of which this Court addressed itself in Cary v. Saffold just a couple of terms ago. The Court recognized that sometimes the State court may choose to include the phrase on the merits to give a reviewing court an alternative basis for understanding why relief was denied, or to let, for example, a pro se Petitioner, who are typically the ones that present petitions for writs of habeas corpus in the California Supreme Court, know that their case wasn't denied because of some mere procedural technicality, but because the claim itself was substantively meritless. Well, that's feeding into your adversary's argument that when the Court does a summary denial, you don't know whether it's procedural or merits. That's his argument. You're adopting his argument? No. No. Our argument is that it's a long, subtle, established question of local practice that when the California Supreme Court renders a silent denial, simply says Petition for writ of habeas corpus denied, it is understood by the Court's litigants, it's been well established for over three and a half decades, that is a merit decision. Sotomayor, what does the Supreme Court do if they all agree that this application should be denied, but two of them think it's for a procedural bar, timeliness, and then others think it has no merit, and they say just deny, but there's no majority for either one? In that instance, then the claim would be presumed, assuming that the Court's order simply reflected Petition denied. Again, it's well understood that that would be a denial on the merits. Even though, in fact, it wasn't? Well, we can't know that. In fact, it would be purely speculative to suggest that the Court had done. So there is that possibility, even though there is that possibility, we should assume it was on the merits. What about, I mean, you said this is three decades, but we're told that the California Supreme Court has this pattern of saying merits when it's on the merits, giving a citation, if it's a procedural bar, to the procedural fault, and when it says simply denied, that's most likely that they couldn't all agree on the reason. Well, I would respectfully disagree with that suggestion, because it simply says denied without including the phrase on the merits. It's not a merits determination. But that's what they would say if, in fact, they were divided, right? I'm sorry, what? If, in fact, the Court was divided, all agreed that the petition should be denied, but there's no majority for any particular reason, merits or procedure. They would say Petition denied, right? Yes, if it's a straight silent denial and the Court doesn't invoke either a procedural bar to deny relief or forego the procedural bar and find that the claims are substantively meritless in any event. What I submit that the silent denial simply means is the Court didn't agree that there was a basis for invoking a procedural bar, the claims were meritless, and it simply orders the petition denied, which is, again, well understood. It's a well-established practice in the State and Federal courts in California that those silent denials are merits determinations which are entitled, then, to add pedeference under the statute. Even the Ninth Circuit in the en banc decision in this case recognized that the California Supreme Court's silent denial was a merits determination, which it then had to review. Does the Court sometimes deny explicitly on procedural grounds? Yes. And when the Court does that, it will reflect such in its orders. That's discussed in footnote 34 in the Robbins case, which we discuss in our brief in this Court. The Court says when it's going to invoke as a basis for denying relief on a Federal claim, it will indicate that in its order. If it's relying on a separate State procedural default, for example, if it's a successive petition or the claim was previously raised on direct appeal or a petition. Scalia You're saying that if it's on both grounds, if they agree with both the procedural and the merits ground, they may well just deny without any explanation. But if they deny only on the procedural ground, they will say it? Yes. If we looked back at a sample of the cases in which they have simply said denied, would we find cases in which no procedural bar was raised by the State? I don't know the answer to that question because I haven't researched to find out whether or not in any of those cases, like in this case, the California Supreme Court directed the Attorney General to file an informal opposition or some other pleading that would have addressed that question without knowing whether or not there was briefing on those particular cases, and there's no suggestion in Respondent's brief that that was done. I couldn't guess on that. Was there a procedural issue in this case before the California Supreme Court? Yes. What was that? Timeliness bar, among others. What was the basis of that? That the claim of ineffective assistance could and should have been discovered at an earlier time than when it was presented to the California Supreme Court under California's timeliness rule, which would require that counsel present the claim of, in this case, ineffective assistance upon learning of the factual basis to support such a claim. So it took 14 months for this petition to be filed to the State court. Do you have cases that show whether those 14 months are presumptively unreasonable under California law? Yes. And that's basically the Clark case that's also discussed in our brief. So there was great validity, you think, to your timeliness, so this timeliness claim, and despite that, you believe the silent denial was an adjudication on the merits. Yes, because I would submit that when the State argued that the claim was procedurally barred by reason of untimeliness and the State court did not invoke that as a bar to relief, it necessarily concluded that the claims were unmeritorious, because they otherwise could have been barred by a procedural bar, but they were not. I thought you just told me that if they agreed both with the procedural ground and the merits ground, they could issue just a denial without explanation. Now you're telling me that the opposite. If I said that, then I misspoke, or perhaps I misunderstood the Court's question. What I'm suggesting is if the Court invokes as a basis for denying a Federal claim a State procedural bar, it will reflect that in its order. That will always be in the order. Yes. Breyer, but if in this case they did reject it on a procedural ground and it was a reasonable ground that they apply consistently, then the Ninth Circuit or the Federal courts couldn't consider the claim at all. Is that right? That's correct. Assuming that the Federal courts agreed that the State bar was independent. If in fact they are right, if in fact the State was correct that this is procedurally barred, they should have raised it earlier, they didn't. And if that was correct and reasonable and proper under both Federal and State law, then you shouldn't be in this subject at all. Is that right or not? Yes, that's correct. So normally, to decide a matter on a substantive, to have a presumption they were deciding it substantively, rather than procedurally, will help a defendant, though not in this case. That's correct. But you didn't raise — you haven't argued that it's procedurally barred. Not in the Federal court. So you may have waived that. On the other hand, your opponent, as I gather, until they got here, never argued that it was based on anything other than the merits. So they might have waived that. Yes. I would submit that. So everything might be waived here. Well, I'm not sure. We never invoked a procedural bar in the Federal court insofar as the presentation of these particular claims. One thing that's not waived is the second question of the first, which is the merits of the Strickland claim. And maybe this would be a good point for you to switch to that. I would be pleased to discuss that with the Court. We've argued in our brief, and I think it's crystal clear. First of all, the Ninth Circuit's grossly overbroad explication of a so-called Strickland standard that would require counsel in every case in which the prosecution presents a risk of crime. I'm sorry. Sotomayor, did they explicitly say in every single case you have to consult an expert? No, they didn't say that. What did they say in the circumstances of this case, given the nature of the issues, that consultation would have been effective? That is — that certainly is one reading of the Ninth Circuit's opinion. I submit that the more concrete reading, so to speak, would be if the Court looks at the language that the Ninth Circuit uses in discussing this standard, they essentially say, since counsel should have reasonably expected the prosecution was going to present this forensic evidence, he should have not only investigated it, he should have consulted with experts, he should have presented them. We could take issue with the timing of that consultation, but let's assume that it had consulted an expert, that that expert would have told him that one of those blood spots absolutely had to be Klein's near the bedroom. You would have no quarrel with saying it would have been ineffective for that counsel to have failed to confer with an expert, wouldn't you? No, I would disagree with that. You would say even if the expert were to give that kind — an expert would have given that kind of exculpatory information, that that would not have been ineffective. Let me start by saying this. First of all, we can't know, and no one can ever know, that Klein's or Johnson's blood, for that matter, was in this blood pool that the Ninth Circuit posted. I'm not talking — I gave you a hypothetical. Different from the facts of this case, I take the Ninth Circuit to be saying, if you are in an area and you are a lawyer where you have no expertise, and your case depends on a technical issue, it behooves you to at least talk to an expert to find out if you are on the right track. And if you fail to and you get something that is completely exculpatory, you are ineffective. So I pose the hypothetical. If an expert would have looked at all of these test results and said, that has to be Klein's reason, you are positing that even under that circumstance, there would not have been ineffectiveness for the failure to consult with an expert. Is that what you are telling us? Yes. And the reason why I say that is because it's important to remember that the critical forensic evidence in this case, that the jury was— You keep wanting to return to this case, and I respect why you want to, but I'm positing a hypothetical that underlies, I think, the Ninth Circuit's point. It may well be in this case that the consultation would have resulted in no prejudice. That's different from whether it was effective to ignore a consultation. Those are two different questions. I suppose accepting the Court's hypothetical as stated, that counsel was aware of and that testimony would be presented, could be deemed deficient performance. Under— Why do you think it makes a difference whether the expert would have helped or not? I mean, counsel has to make that decision of whether to call an expert ex ante, not ex post. I mean, you — we shouldn't evaluate his decision on the basis of whether, even if it's a thousand-to-one long shot, it turns out that that testimony would have been very successful. Don't we have to examine it ex ante before he knows what the result will be? Yes. And I think it's important to look at, as this Court has described in the Strickland case itself, we have to view from counsel's perspective at that time, what did he know, what could he have reasonably expected the prosecution's evidence to be, how was he going to meet that evidence, what tactical or strategic process— Well, but Justice Sotomayor's hypothetical would include the situation where he doesn't know that the prosecution is going to introduce any expert testimony. He knows that there's blood there. He should get his own expert, whether or not the prosecution uses one. Right? I mean, can it never be ineffective assistance not to call an expert where, so long as the prosecution doesn't have one on the other side? No. I would submit that it certainly could be deficient performance if counsel fails to investigate readily available evidence that could lead to exculpatory evidence in support of his client's defense. That's the hypothetical, I believe, that Your Honor asked a moment ago. Well, could. Really, is that your test, it could? There's some remote possibility? Again, I think it would be — it's going to be fact-specific, depending upon the kind of case. It may well be, in a given case, that forensic testimony would not be controverted, would not be disputed. It wouldn't be relevant, necessarily, to the defense. Let's say, for example, that there was no dispute that the person who committed the offense left DNA evidence at the crime scene, and it's clear that the DNA evidence suggests that the perpetrator was the defendant. Then the court — then the defense attorney isn't going to profit by consulting an expert to dispute an indisputable issue. But isn't it the reality that sometimes the defense doesn't want to have an expert, because the expert may turn up findings that are adverse to him, and it's better for the defense counsel to just leave things murky and argue to the jury that the State didn't produce the evidence either? I mean, that's a perfectly legitimate strategy, isn't it? It is. And I think that in many instances, that would — that would inform a defense attorney's strategic choices as to how to present the defense in a given case. And that's the — Ginsburg. Mr. Colombo, you say in any event, leaving aside the question of whether there was ineffective assistance of counsel, even assuming there was, there would be no prejudice in this case. That's correct, yes. And could you just summarize why you say there would be no prejudice? Well, first of all, I think it's important to recognize that the expert declarations that were preferred by Respondent in support of this habeas petition really don't challenge the testimony that was presented in the State trial by the State's experts, specifically the question of whether or not the murder victim could have been moved from supposedly the area outside the bedroom door onto the couch. The testimony at trial suggested that that distance was somewhere between about 20 and 25 feet. There was no evidence at the crime scene that suggested the victim had moved from the point where he was shot with a fatal gunshot wound. What about the pool of blood? There was one expert affidavit that said something that Johnson standing up could not have produced that amount of blood. I think the actual expert declaration suggested that the prosecution's theory, as the expert described it, could be eliminated because Johnson could not have bled into the blood pool sufficient to have formed it by merely standing and waiting for the police to arrive. I think it's important to realize the distinction between the prosecutor's theory, which he propounded in his closing argument, versus the evidence that the jury actually heard at trial from the State's own blood spatter expert that suggested in order for Klein to have been moved from the point where the blood pool had formed onto the couch where his body was discovered by the police, there would have been some trail or some indicia, some evidence that would have suggested that he had to have been moved from that point. And the more important question, I suppose, would be, as the dissenting opinion pointed out in this case, why would the victim have been moved if he had been shot at that location? Why would he have been moved onto the couch? It certainly makes no sense for another victim who's already shot, who's intoxicated, who's wounded and moving around in the house, why would he have wanted to have moved the victim of the gunshot wound to the head from point A to point B? It just doesn't make any sense. And there's never been anything in any of Respondent's expert declarations that suggests a rational explanation for how or why that could have happened. Ginsburg. On the no prejudice issue, are you relying just on what happened, what was found at the scene of the crime? I mean, you said it's implausible that Klein would have been moved with no trail of blood at all, so you say therefore no prejudice. Anything else that goes into your no prejudice argument? Yes. I think for all of the reasons that are discussed in the dissenting opinion at pages 193a to 194a of the petition for writ of certiorari, excuse me, the appendix, as the dissenting opinion points out, it certainly was the – there's no evidence in the various experts' declarations that suggest, first of all, why the jury would have believed Respondent's trial testimony that after having essentially partied with the two victims for several hours the night before, they suddenly leave, go back to their place of employment, come back two hours later to return property and a firearm to another occupant of the house they had no reason to believe was actually there. Then they're suddenly surprised by these two victims that there is a spontaneous gunfight that ensues involving a firearm that's never found, that's never attributed to either of the two victims in the house, that could have only been attributable to the Respondent himself. So the jury had all of that evidence to consider, and we balanced that against these, as I again described them, inconclusive and speculative expert opinions that are preferred in support of Respondent's habeas petition. The jury could not have been persuaded to find the defendant not guilty, even had that evidence been introduced. So necessarily, Respondent could not have been prejudiced by the failure to introduce that evidence, assuming that that evidence was, in fact, available and could have been presented in this case at the time of Respondent's trial. Was there additional physical evidence found not at the scene? Yes. In fact, the other thing that really tied the Respondent into this crime was that there was an expended casing at the crime scene that matched perfectly with a loaded firearm magazine with the exact same kind of bullets and a box full of the same exact bullets in the Respondent's house when the officer served the search warrant, along with the stolen gun safe and some evidence that there was marijuana there, which the victim, the surviving victim, was admitted to be a marijuana dealer. Can I ask you a question about California procedure? Is what happened here unusual? Is there — does the prosecution have an obligation to provide notice before trial of its intention to call expert witnesses? Yes. Under California discovery rules, a prosecution would have to disclose to the defense any evidence it intends to introduce, either by way of lay testimony or expert testimony, before the trial commences. And if the defendant requests that, it does — what's the defendant's reciprocal obligation, if any? The defendant would have to disclose any witnesses that he or she intends to introduce at trial, including expert testimony and any reports supporting such experts. Unless the Court has any further questions, I would like to reserve my remaining time. Thank you, Mr. Colombo. Thank you. Mr. Gardner. Mr. Chief Justice, and may it please the Court. The Court has invited briefing in the additional question presented on the application of AEDPA in this case. And in light of the Court's many questions this morning, I want to address that. But I did want to clear up one piece of information that seems to be confusing in the record, and if I can start with that. And this was in response, I think, to a question you asked, Justice Ginsburg, regarding the prejudice prong of this trickling claim. And the question was, why is it not — why is it harmless? And counsel suggested that there was an absence of blood between the blood pool and the couch, and Detective Bell testified to that. And I just want to clear up, because I know this bit was confusing in the briefs, too, that is not what Detective Bell testified to. If you look at pages 181 and 195 of the reporter's transcript in Exhibit R-5, you'll see that Detective Bell says, yes, there were drops leading away from the couch. Yes, there were drops leading away from the blood pool. And, in fact, Exhibit R-5 is a picture of the couch, and you can indeed see. I thought that the point was that there was no trail from the bed. I mean, the theory was that Klein was removed from the bed to the couch. And I thought that the point that the — that counsel for the State emphasized was that if someone were moved from the bed, taken to the living room couch, you would have expected to see a trail of blood from the bed, and there wasn't that. Indeed. But the State's theory, the defense theory was that the body had been moved from the blood pool, not the bed, the blood pool to the couch. And the State's response in its briefing and today at oral argument was that there was no blood trail between the blood pool and the couch. And, indeed, that's not what Detective Bell testified to. He said there were drops outside the blood pool, drops outside the couch, and when asked if there was blood in the carpeting in between, he said he did not remember how much blood there was in between. So the idea is that Johnson drags Klein, this is your theory, right, because you're not suggesting he could have lifted Klein and walked him over, are you? Yes, I think he could have lifted him, Your Honor. Really? Did you have an expert testify to that? No. Did you get expert testimony about that or an expert report about that? No, there was no expert testimony about the ability of someone to lift a weight. But you think you can assume that he could lift a weight. How much did Klein weigh? I think he weighed between 150 and 160 pounds. And Johnson? I think about the same, Your Honor. Okay. And you say that he could have dragged him from the pool to the couch because there were drops. I'm saying that the testimony and the suggestion that there was no trail of blood between the blood pool and the couch is not consistent with what Detective Bell testified. And what's your theory about why he, why Johnson would have a motive to go through this exertion? He's wounded, and let's say there really was a gunfight and Klein fell someplace else, Johnson wants to make it seem like Klein was, that there wasn't any gunfight. Why is it so valuable to him to move Klein's body from the location where you think he fell to the couch? Well, if he falls in the bedroom doorway, Your Honor, and he falls in a crossfire, then Johnson is in some ways culpable. Now, we don't know what the extent of his culpability is, but if he's involved in firing the first shot, he is culpable. Putting Klein on the couch and having a State's theory that Klein is shot in cold blood on the couch eliminates his culpability or at least eliminates the risk of it. But he could have, if he's going to make up a story, he could have made up the story that Klein jumped up and he was shot without having engaged in any firing himself, and he fell wherever he fell. Putting him on the couch doesn't seem to, unless I'm missing something, I wish you'd explain it, doesn't seem to aid this purportedly false story very much. And if you weigh whatever benefit there is from that against the exertion of moving this guy, it doesn't seem to make a whole lot of sense. But maybe there's something there that's not apparent. Well, I can only say that if Klein is caught in a crossfire, then Johnson is culpable. And let's remember he has drugs in the house, he has scales, he has all sorts of drugs in the house. Why wouldn't he wipe up the blood? I mean, what good is it to simply put him on the couch when you leave the pool of blood, showing that that's where he was shot? Yes, I don't doubt that, in retrospect, he could have come up with a better plan, Your Honor. But I do think it's important to realize that this plan, at least on its face and initially in terms of his adrenaline response, is going to get him out of a crossfire scenario. Sotomayor, there's a lot of talk about the importance of this pool of blood, but as I read Detective Bell's testimony, he never posited or talks about how that pool was formed. Only your expert does that. What Bell does talk about, however, is that there's a high-velocity blood splatter in front of the couch and that the pooling of blood on Klein's face shows that he was shot there. Your experts do nothing to refute that testimony, which was really the basis of Bell's testimony. He had nothing to say about the pool of blood. He talked about why Klein was shot where he was shot, and there's no expert testimony to refute that. So how do you get past there being a reasonable probability of a different verdict when there is nothing to refute the critical testimony at issue that Klein was shot where he was shot because there's high-velocity blood splatter in front of him and because the pooling on his face shows that? Let's take both the high-velocity blood splatter and the pooling, Your Honor, but let me start with the predicate. And you are right, Detective Bell did not testify at all about the formation of the blood pool, and that's why this case isn't about anticipating a State's ruling for your own case. But turning to the specifics of your question, the high-velocity blood splatter, it actually wasn't in front of the couch, Your Honor. It was to the side and below the arm. And let's remember Detective Bell's testimony about how the homicide occurred, because the State's theory was not that Pat Klein was shot while he was lying on the couch, but that he was sitting on the couch. And so what's most interesting about the high-velocity blood splatter, since he's  This was a matter of some confusion in the briefs as well, but I think it's been cleared up. There's no high-velocity blood splatter behind, on the pristine white wall. So the question is, if he's shot while sitting up, the high-velocity blood splatter that Bell testifies to travels about 4 feet over the couch and then two drops sink down. Now, in terms of the jury evaluating that testimony, it's important to note that Detective Bell gave a description of what high-velocity blood splatter is, and he said that it's a fan-like pattern of atomized blood. And when you look at these two drops, these two drops alone that travel 4 feet and then drop straight down to fall on a plastic bag, you see, as defense counsel pointed out in his closing argument, that they are the same size as blood drops found in the kitchen on exhibits R-18 to R-22. And Detective Bell's entire theory for why these were high-velocity was their size.  Roberts, counsel, what other expert evidence should Richter's counsel have pursued before deciding upon his course of action in this case? Put aside the blood splatter expert. What other experts did he need to consult? Put aside the blood splatter issue, and these were raised in the lower court but not addressed. There were he promised the jury ballistics testimony as well, which he didn't produce. Okay. We've got a blood splatter expert, a ballistics expert. Go on. I thought in their habeas proceeding you said he should have consulted a serologist and a pathologist. Okay. That's four. Why wouldn't he have wanted to talk to an expert on the effects of alcohol and drugs on the people's different perceptions of the events? Well, I think the chief reason is, is that that wasn't part of his theory. If you look, and really the guide to this, Your Honor, is defense counsel's own theory. Because defense counsel stands up in opening statement and he promises the jury a theory. And the theory isn't you're going to hear two stories and you have to assess credibility. His theory, as he explained to the jury, was the physical evidence will show you Pat Kline was not shot on the couch. Well, he had not received a notice from the State that they were going to call in experts. So why wasn't it reasonable for him to assume they're not going to call in the experts, they're not going to be able to pull experts out of their pocket in the midst of the case, to allow them to do that without providing, without granting a recess? What seems to have happened here seems pretty unusual. Well, if this case were about anticipating the State's decision to call an expert, I would agree, but it's not. And the reason it's not is because we have an insight into what defense counsel's theory of the case was before the State ever started its case, Your Honor. I think the Ninth Circuit said that part of the ineffective assistance was failing to consult an expert in planning his defense and in preparing his defense, not simply responding to the State's expert in the middle of trial. I agree, Your Honor. And if I said something that sounded like I didn't, then I misspoke. My point is that that's exactly the theory. Once defense counsel decides on this defense, in this case, I think he picked the right defense. He told the jury the physical evidence would prove Pat Kline wasn't on the couch, and he could have done that. But despite promising the jury that the physical evidence would prove this, he never    Yes, I did, and I didn't get back to it. Thank you, Your Honor. The testimony was, of course, about the blood pattern flow on the face. And when you read Detective Bell's testimony carefully, that testimony has nothing to do with where Pat Kline is shot. It has to do with the angle of his face after he's shot. So if he's shot on the bedroom — in the bedroom doorway and falls, and that's the angle, the blood flow would be the same. So it really — the blood flow pattern really has little to do with where he's shot, but just the angle of his face. And getting back to the blood spatter itself, the blood pool itself, what's interesting is this case, in this case now, is that even after all these years, the State has never disputed the fact that the absence of satellite drops means the State's theory is false. Gunner Johnson could not have deposited that blood because there's no satellite drops, which means it had to come from another source. The only other source is Pat Kline. Did I understand you? I just want to step back to the prior answer. You think what counsel did here would have been effective assistance but for exactly what he said in the opening statement? If — I'm sorry. If the question is but for the opening statement, would we still have this argument? Yes, although it would be much more difficult to establish what his theory was. The opening statement doesn't change the Strickland analysis. It simply gives us an insight, an easier path into knowing what counsel's theory was, much like the case of Wiggins v. Smith, where the Court looked at defense counsel's opening statement in the penalty phase repeatedly to see what was his theory and what didn't he do. And when there was a suggestion made in Wiggins v. Smith that, in fact, counsel's theory was something else, the Court said, no, look at his opening statement. We know what his theory was. So it doesn't change the standard, but it gives us a very keen insight into exactly what he was thinking and when he was thinking it. Ginsburg. Mr. Gardner, what about the argument that all of this is beside the point, because the argument for prejudice is so weak, given all the other evidence that Mr. Colombo referred to? Well, it will come as no surprise to know that I disagree with that argument, Your Honor, and for a couple of reasons. The cases really came down to Gunner Johnson v. Petitioner Richter. Who was the jury going to believe? Even on the record that counsel has described, the jury deliberated 14 hours. And remember, that record included a surviving eyewitness, and if you believe the surviving eyewitness, the case is over. The jury deliberated over 14 hours, asking for re-instruction twice and a rereading of testimony three times. And I think there's good reason for that. Well, of course, Johnson had given so many inconsistent statements at the outset that he was a weak prosecution witness. It seems to me the defense could have pinned a great deal of hope on that. Well, I think actually I agree with the predicate of the question, Your Honor, and that is Johnson had given a number of stories. He had given four or five different stories. And after all, he knew both Branscombe and Richter. When he first spoke to the 9-1-1 people, he said, what happened? He said, five people came in and shot me. Then he said four, then he said three, and when they said who, he said, I don't know. So clearly, Gunner Johnson was a compromised witness, Your Honor. But the fact that the State has a compromised witness is not the reason not to research the physical evidence and enhance your client's credibility. It's more of a reason to do it. But what do you do with the ammunition back at Richter's home that the gun safe is found there, the unlikely story about them going, having a zeal to clean up their workplace and then coming back? Well, let me take them one at a time, Your Honor. And in a sense, the ammo and the gun safe, the answer is very similar. All parties agreed in this case that several weeks before the incident, Gunner Johnson had stored all his belongings at my client's house. And so the only dispute was, had the gun safe included? And this is one of the unusual features, is that the State's theory requires us to believe that this happened so he could rob a gun safe that had been at his house for weeks. The question was, had the material, the gun safe and the ammo, whose was it, and had it been taken back to Gunner's house? The ammo is found in a place with two other things. It's found with a scale used for measuring drugs, and it's found with shotgun ammunition. Now, the record shows that Gunner Johnson had a shotgun, and Gunner Johnson was a drug  So the defense theory, of course, is that this ammo wasn't my client's. It was Gunner Johnson's and hadn't been moved back. Similarly, as to the safe, there was conflicting testimony as to whether the safe had ever been moved back. So that really is the explanation, and that, I think, is why the jury had such pause about this case. When it heard the case. Roberts The case against Gunner you've just described, would it have been enough, and wouldn't that have justified counsel's decision to focus on credibility rather than expert physical evidence? I think not. And we know this, again, for two reasons. And let me start by saying the fact is that when counsel was asked, that wasn't the reason he gave. It's not as if he came to the debt when he said, this was my tactical reason, and so we can say, okay, that's a reasonable tactical decision. That wasn't the decision reason he gave. When asked, did you decide not to present, why didn't you present this blood spatter testimony, he said, I simply didn't know it was out there. And after all, let's keep in mind, this was only his second trial, his second murder trial. He didn't know it was out there. So he didn't make that tactical decision, and that's the first reason. The second reason, I think, is that, and almost every case that has ever addressed this, and I have cited most of them, has come to the same conclusion. When there is a credibility determination, when a defense, any defense lawyer worth his salt knows that there is a credibility determination to be made, the jury is going to believe either this story or my client's story, it at least behooves you to investigate, to see if the physical evidence can support your position. You can always make a case.  But did he also have to investigate the other aspects? I mean, we're talking, we're focusing on the scene where the shooting took place. Did he have to consider experts with respect to the bypass, where they threw the guns, Victor's apartment, the vehicle that was used? One thing counsel said is he thought about hiring a tire expert because of the vehicle. He has to look at the possibility of expert testimony affecting every aspect of the And the reason, again, comes back to the same focus this Court had in Wiggins, another failure to investigate case. What we know is that counsel suggested to the jury, told the jury in opening statement, this is about the physical evidence, the physical evidence will show this. When counsel, when it's clear that that's counsel's position in a case, it's simply application of the Strickland test, it's unreasonable for counsel not to at least have investigated the physical evidence that he told the jury would show that Klein wasn't on the couch. Roberts. What does, what happens, I know you're, have an answer that that's not this case, but what happens if the defendant tells his lawyer, look, I did it, I'm guilty, and the lawyer decides that the best thing to do is try to pin it on a guy whose nickname is Gunner? Does, does, what else is the lawyer supposed to do? He thinks no matter what, what physical evidence is found, it's got to cut against his client because his client did it. Well, in a situation where, where counsel's investigation will not be exposed to the prosecutor, and there were questions before about how California procedure works, and indeed, once you decide to name, to call a witness, you name him and he becomes exposed for cross-examination and for investigation, but at least in terms of your private investigation of a case, the ABA standards are fairly clear that even an admission of guilt doesn't affect your ability or your obligation to investigate. If, if the expert says that the pool of blood all belonged to, I guess it's Johnson, I certainly think ethically that you could not argue otherwise to the jury. I think ethically you couldn't argue otherwise to the jury. All right. So that's a reason why defense counsel, in the case the Chief Justice puts in many cases, prefers not to have experts just so they can punch holes in the State's case. That's a legitimate strategy. And this counsel was very, an adept cross-examiner. There's no doubt about that. I don't disagree, except that again we come back to the notion from Wiggins, which is you can't defend a tactical judgment that wasn't made. And in fact, when counsel was asked, is this the reason you did this, he said no. I didn't call Bloods Better expert because I didn't know it was out there. Scalia. Can I come back to your response to the Chief Justice's question about counsel who knows that his client is guilty, and you say the ABA standards say that even when that's the case, you have an obligation to get an expert witness to confirm that the client is? I'm sorry, I thought, I thought the hypothetical was counsel's client said he was guilty, not that counsel knew he was guilty. The ABA standards say that the duty to investigate, the broad duty to investigate on defense counsel exists irrespective of the client's statements to his lawyer. We've never adopted the ABA standards. In that regard, no. That standard seems to me quite silly. You know, I can understand that, Your Honor, but from practical experience I will tell you the fact that a client admits to something doesn't mean he did it or she did it. That's the real world consequence we face as defense lawyers. Often our clients tell us things and you can't always believe them, whether they say they're innocent or whether they say they're guilty. Scalia, well, I'm sure they often say they're innocent when they're guilty. I'm astounded that they often say they're guilty when they're innocent. Well, you know, I'd suggest, Your Honor, the false confession literature that's come out, and there's plenty of it to show that, in fact, that's not an infrequent occurrence. To the police, perhaps, yes, but to his own counsel? I'm not aware of any literature to that effect. In which case, I'll come back to the answer the Chief Justice suggested moments ago that that's not my case. It seems like a safe haven at this point. Roberts, Your case does involve the AEDPA issue. Perhaps you want to turn to that now. I was trying to use that as a segue into that, Your Honor. Thank you. It worked. It worked. That rarely happens, Your Honor. And let me turn, then, to the AEDPA issues in this case, because on March 28, 2001, this California Supreme Court denied the petition for writ of habeas corpus in my client's case with an order that said the petition for writ of habeas corpus is denied. That same day, in five other cases, noncapital cases, the California Supreme Court denied the writ saying the petition for writ of habeas corpus is denied on the merits. And the State's position here today and in the briefing is that the Federal court should simply ignore that difference. And I don't believe that's the case for several reasons. Ginsburg, what is your answer to the representation that Inree Robbins settled the matter from a State law perspective, but not as the Attorney General has suggested? Inree Robbins says a few things. First, it says that when we deny a case on the merits, we add the phrase on the merits. Then it says that when we find a procedural default, we cite to that default so that everyone knows. And then it says, and this was in response, I think, to a question you asked, Justice Scalia, they say a third thing. They say sometimes we'll find both, that it's meritless and it's defaulted, and we will say both. We will cite a default and we will say it's denied on the merits as well, trusting that the Federal courts will give deference to both. Breyer. What they cite it for, actually, is they make a slightly different argument in their brief. They say going back to 1974, there are at least three cases in the Ninth Circuit that have said when the California Supreme Court says nothing, just denied, we take that as a decision to reach the Federal issue and deny it on the merits. Now, not in your case, but in most cases, that will benefit a defendant, because it will avoid the question of whether there's an adequate and independent State ground of a procedural nature. So what they're saying is that that's the Ninth Circuit's statement in three cases, and the California Supreme Court over a course of 30 years has never said to the contrary, which it had plenty of opportunity to do, and in other instances where the Ninth Circuit was wrong, it did do it. So that, I think, is a fairly strong argument. Now, you're going to be the only reason that you're not out of court on your own interpretation is because you'll say that the State waived the procedural issue, and then they'll come back and say so did you. So what is your response to all that? Well, there's a whole bunch there, so let me see if I can tease it out. It is true that the Ninth Circuit has had this process, this procedure for a long time, and of course it developed in a pre-AEDPA world when the fact that whether something was on the merits or not didn't really matter. The only question was, was it defaulted? And if it was defaulted, it might bar Federal review. Whether it was on the merits was really irrelevant because before 2254d, that really didn't matter. So that's where, and I agree with the State, that's where those cases come from. I don't believe, however, that the waiver argument is really implicated here, Your Honor. Breyer. Well, look, for example, in Hunter v. I. Spurrow, they quote it as saying the following. The California Supreme Court's denial of a State habeas petition, quote, without comment or citation, constitutes a decision on the merits of the Federal claims, end quote. And then they have three other cases roughly to the same effect. Now, what you're saying is that this Court should hold to the contrary, and by the way, in doing that, we will bar many Federal habeas petitioners from the Federal courts, because what it will mean is that there is an adequate and independent State ground in case after case, which perhaps is an irrelevant feature. But nonetheless, the silence of the California Supreme Court is significant, I think, when faced with those pretty clear interpretations of what their silence means by the Ninth Circuit. Yes. And actually, if the Ninth Circuit were the only voice in the fray, Your Honor, I think the argument would be stronger. But the Ninth Circuit's voice isn't the only voice in the fray, and that brings me to Yilts. In Yilts, of course, the Ninth and Yilts v. Nunnermaker is a case which is part and parcel of this history from the Ninth Circuit of saying silent denial is on the merits. In Yilts v. Nunnermaker, that's exactly what the Ninth Circuit said. And it came to this Court, and the State actually argued that it wasn't on the merits. And indeed, this Court held that you cannot tell from a silent denial whether it's on the merits or not. That's the first response, Your Honor, is that there are additional voices other than the Ninth Circuit. The second is that well after Hunter v. Esparro comes the Robbins footnote. And in the Robbins footnote, the State says, Sotomayor, I'm having a very hard time with your reliance on that footnote, because the very last paragraph of that footnote says, When Respondents asserts, and I'm shortening the introductory line, a State procedural bar, and when nevertheless our order disposing of a habeas corpus position does not impose the proposed bar or bars as to that claim, that signifies that we have considered Respondents' assertion and have determined that the claim or subclaim is not barred on the procedural ground. So the footnote itself says, unless we invoke the procedural bar, we're not applying it. I think that's right, Your Honor, but that's not the only thing the footnote says.  When we deny on the merits, we say on the merits. When we cite a procedural bar, we mean the bar. And if the State has raised a bar, as they did here, and we don't rely on it, that means we haven't relied on the procedural bar. When you put those together, what it means is there was no majority for a decision on the merits, otherwise they would have said on the merits. There was no majority for a decision on procedural default, otherwise they would have said default. And that's what a silent denial means, and that's exactly what this Court said in Yilts. You cannot tell because there are seven judges, there are different claims, there are different possibilities. That's why a silent denial is there in State court. It's for precise reasons. Scalia, there's no majority for either ground, and yet you find in favor of the State? How can that be? Well, you say either ground. There are multiple grounds for procedural default, Your Honor, under State law. There are many possible procedural defaults. But you're positing that the only time they do not say either procedurally barred or on the merits is when they don't have a majority for either one. That's correct. How can they render a decision in favor of the State, then, if there's no majority for either disposition? The question is why deliberate to a majority when, when they sit around the conference, the seven judges, let's say two judges believe there's a procedural default of untimeliness. Two judges think it's timely, but think it should have been raised below. Two judges think it's both timely and it didn't need to be raised below, but it hasn't been played with sufficient specificity, and one judge thinks it's improper on the merits. There's seven judges. They all believe it should be denied, but there's no majority for any position. There's no reason for the California Supreme Court, and this is addressed more in the amicus brief by the California Academy of Appellate Lawyers. There's no reason for the California Supreme Court at that point to spend a day, two days debating it, when all seven judges agree there's a reason to deny the position. Alito, under your example, isn't there a majority for the proposition that there's a procedural default, a disagreement as to the particular procedural default? That could be. And what the California Supreme Court says is that there's a majority for the position that there's a procedural default, a disagreement as to the particular procedural default. If it's just a binary choice between procedural default and merits, isn't there going to be and everybody agrees it should be denied, then there's going to be a majority for one or the other, right? That is true, and I have been unclear, and I apologize for that. It is not a binary choice between default and merits. It's a choice between which default and merits. And there are many defaults under State law. When the Court denies on timeliness grounds, it will cite Clark. When the Court finds that there's been plead with insufficient specificity, it will cite Swain. Sotomayor, is there more than one possible procedural problem here? Yes. I thought it was just timeliness. Well, timeliness was the only one raised by the State. But to be sure, like this Court, the California Supreme Court has never been bound in terms of its procedural default findings by what's been raised. And for others could apply in this case. Well, at the risk of not wanting to argue against my client, I can give you some that could apply that haven't been suggested and therefore are most certainly waived. But the California law often requires that you file your habeas petition in a lower court first. Reviewing courts often deny petitions for failure to file in a lower court first. There is a requirement that says you must plead with sufficient specificity. That's often relied on by reviewing courts. There is a requirement that says you must attach all readily available documents. That's another. Ginsburg. With this confusion, your version, your colleague's version, when the district court, the district court denied relief, did you ask the district court, please certify this question of what a silent denial means, certify it to the California Supreme Court, so we will have once and for all an answer of what a silent denial means? The answer is no. I didn't request certification. When we were in district court and when we were in the Ninth Circuit, both sides accepted the existing framework the Ninth Circuit had established. It applies to a silent denial, but only under, only through the lens of independent review. The Court's added question has put both of those at issue. Thank you, counsel. Thank you, Your Honor. Mr. Colombo, you have four minutes remaining. Thank you. I think it's important to remember this is an AEDPA case. It's always been an AEDPA case. We've never asserted this case was not an AEDPA case. The Court's had a very spirited discussion this morning, essentially conducting a de novo Strickland review of the claims that are presented in the district court in this case. It's important to remember that we have to view, as this Court described in Woodford v. Vachotte, a Strickland claim through the lens of the applicant's burden to demonstrate that the State court's resolution of the Strickland claim on the facts of his case was objectively unreasonable. Whether this Court were to choose to find that the California Supreme Court's determination, if it were reviewed de novo, was improper is different from determining whether or not the State court could have reasonably concluded on the factual record presented to it that the applicant's claim failed to show a basis for relief. Breyer. Is it fair to say that this, in this case, that every party in the lower courts assumed that this was going to be a merits-related issue and that some deference was due and that nobody ever said anything about it being a procedural issue where there would be a procedural bar of some kind that was either waived or not waived? That's correct. So the first time anybody mentioned this procedural issue was when? When Respondents' counsel filed its brief in opposition in this Court. So it was on the merits brief in opposition. That's correct. There's nothing before that. Yes. It wasn't part of the question. We added the question. Well, I would submit that if there was a dispute about the applicability of AEDPA deference to the California Supreme Court's sonnet denial in this case, it should have been raised much earlier than when we got to this Court. No, no. I'm saying they didn't raise it to start with. We added the question. Yes, that's true. So it wasn't as if they were trying to get around their own waiver. No, I wouldn't suggest that Respondents' counsel was avoiding that. I'm suggesting that if this was a legitimately disputed question, it could have been addressed much earlier. Excuse me, you've lost me. I thought you said they raised it in the brief in opposition to the petition for cert. No. No. It was not raised in the opposition to cert. It was not raised and it was not presented until merits briefing in this Court. Until the merits brief in opposition. Yes. I want to, if I may, just touch a couple of points real quickly. On page 23 in footnote, I believe it's six of our reply brief, there's a discussion about what the detective's testimony was in regard to this blood spatter near the couch where the murder victim's body was found. I think it's important to remember Respondents' counsel talked about whether or not this was a blood spatter behind the armrest. What the detective testified to and what's described in our brief is the detective said because this was not a through-and-through exit wound, that is, the bullet lodged in the victim's head, that the spatter would have been what he described as back spatter, meaning the blood would have flown out from the victim's head outward. And that was consistent with what the evidence was at the crime scene that the detective observed when he was there after the murder was committed. What about the drops between the blood pool and the couch? The detective described those as essentially insignificant. They didn't reflect anything other than that someone was moving around in the house, which was consistent with what the crime scene investigators had discovered when they first responded to the 911 call from Mr. Johnson to the police. Is there any reason not to do this? I'm just thinking from our point of view. I mean, I think it's probably correct what you say. Nobody mentioned a word about this procedural issue until the brief in opposition on the merits, not the certainty. And the reason they did was perfectly legitimate. We'd ask the question, well, if we were wrong to do that, could we be ---- and if we took the opinion as being a question of reasonable deference, et cetera, and went into it, is there anything, any reason not to put in that opinion somewhere? Given Yilst and given the Ninth Circuit, it would be helpful if the California Supreme Court, for future reference, explained what their practice does, in fact, mean, whether it's procedural or whether it's on the merits. I would submit that that would be helpful, but unnecessary. Thank you. Thank you, counsel. Counsel, the case is submitted.